2013 UT App 213

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
REGINALD CAMPOS,
Defendant and Appellant.

Opinion
No. 20101042-CA
Filed August 29, 2013

Third District, West Jordan Department
The Honorable Mark S. Kouris
No. 091401831

Herschel Bullen, Attorney for Appellant
John E. Swallow and Mark C. Field, Attorneys for
Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES WILLIAM A. THORNE JR. and CAROLYN B. MCHUGH
concurred.

VOROS, Judge:

¶1 Two men—one an unofficial neighborhood watch volunteer, the other a certified public accountant—got out of their SUVs and squared off near midnight in their Bluffdale neighborhood. Each was armed with a loaded semi-automatic pistol. One shot the other. The victim is paralyzed below the chest. The shooter, Reginald Campos, was convicted of attempted murder with injury, a first degree felony, and aggravated assault, a third degree felony.[1]

---

[1] *See generally* Utah Code Ann. §§ 76-4-101, -102(1)(c)(i) (LexisNexis 2012) (attempt); *id.* § 76-5-103 (2008) (aggravated assault); § 76-5-203(2)(a), (3)(a) (2012) (murder).

¶2    Campos challenges his convictions, alleging a number of errors in the trial and arguing that he was denied a fair trial because he was deprived of his constitutional right to effective assistance of counsel. We conclude that Campos's trial counsel performed deficiently in three instances. While each instance alone might not be sufficiently prejudicial to require reversal in this case, taken as a whole trial counsel's deficient performance undermines our confidence in the verdict on the attempted murder charge. We therefore reverse the conviction for attempted murder. We affirm the conviction for aggravated assault.[2]

BACKGROUND[3]

¶3    Around 11 p.m. on July 21, 2009, David Serbeck, a former bounty hunter and Army sniper, was outside his house packing for a camping trip when his neighbor stopped by to talk. Serbeck's neighbor, the local homeowners' association president, showed Serbeck several photographs he had obtained of suspects and cars possibly involved in recent crimes in the neighborhood. Serbeck thought he recognized some of the vehicles and people in the photographs. The two men decided to drive around the neighborhood, along with Serbeck's nine-year-old daughter, on an unofficial neighborhood watch patrol.

---

[2]We also grant the State's Motion to Strike Defendant's Pro Se Motion for Remand and Oral Arguments Pursuant to Rule 23B.

[3]"When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only when necessary to understand issues raised on appeal." *Id.*

¶4     As they were driving, Serbeck saw two sixteen-year-old girls walking. He slowed his SUV and said out the window something to the effect of, "Hey, what's up?" or "Be careful going home." The girls did not respond, and Serbeck drove on.

¶5     One of the girls was Campos's daughter. When she and her friend arrived at the Campos house, they got into a car and drove to pick up another friend at a nearby house. After picking up the friend, they all returned to the Campos house, and on the way they passed Serbeck's SUV. Serbeck mistook the girls' car for one of the suspicious cars in the photographs. He made a U-turn and began following the car. The girls were "freaked out" and "a bit traumatized" when they realized that the same individual who had spoken to them earlier was now following them. One of the girls called Campos to tell him they were being followed and to ask for help. Campos got his handgun from the house and drove to meet the girls, who by this time had lost Serbeck by turning out of the neighborhood onto a major road.

¶6     After losing sight of the girls' car, Serbeck and his neighbor returned home. Soon, however, Serbeck saw the same car drive down the street. Serbeck decided to go on patrol again. According to Serbeck's testimony, he went inside his house, grabbed his handgun, inserted a loaded magazine, racked the gun, and engaged the slide safety. Serbeck placed his gun under the center console in his SUV, and Serbeck and his neighbor—but not Serbeck's daughter—set out to find the car. Serbeck's neighbor did not know that Serbeck had brought a gun.

¶7     Meanwhile, Campos arrived home with the girls. He sent his daughter's friends into the house and asked his daughter to explain what had happened, though she was too "hysterical" to do so at first. Campos had his daughter get into an SUV, and they went to find the other SUV. As they were driving, Campos passed Serbeck's vehicle. When Campos's daughter identified it as the SUV that had followed her, Campos made a U-turn, pulled in front

of Serbeck, and abruptly stopped, forcing Serbeck to stop quickly to avoid hitting Campos's vehicle.

¶8     Serbeck's and Campos's accounts of what happened next differed in slight but significant ways. Serbeck testified at trial that Campos got out of his SUV pointing his gun at Serbeck and Serbeck's neighbor. Campos "raged," pacing back and forth and "screaming something about someone following his daughter." Serbeck got his gun and got out of his SUV, staying halfway behind the open door. Serbeck asked Campos to calm down and asked what was going on. Serbeck introduced himself as part of the neighborhood watch and said he was with the homeowners' association president. When Campos began to lower his voice and his weapon, Serbeck told Campos he was going to put his gun down. He crossed the gun in front of his chest as he moved it from his right hand to his left, stepped out from behind the door, placed the gun on the ground, and kicked it behind him. As Serbeck again asked what was going on, he heard a girl inside Campos's SUV scream, "[D]on't believe him[;] they are lying, they are lying." Campos said, "[H]ow stupid do you think I am?" As Serbeck was standing back up, Campos shot him.

¶9     Campos related his account of the events to a police officer later that evening. He told the officer that after stopping the SUV, he retrieved his gun from a locked case and put it in his back pocket. He got out of the SUV, keeping his hand on the gun. He yelled to Serbeck and Serbeck's neighbor something to the effect of, "Why are you chasing my daughter?" He saw Serbeck get out of his SUV holding a gun and stand halfway behind the open door. Serbeck said something, but Campos could not remember what it was. Campos heard Serbeck rack his gun and saw him start to raise it. Campos pulled his own gun out of his pocket, racked it, and fired at Serbeck. He then moved to the right to get a better view of Serbeck and fired again. Campos recalled shooting his gun a total of two or three times.

¶10    Serbeck's neighbor testified that Campos had his gun in hand and pointed at the ground when Campos got out of the SUV. When Serbeck got out of the SUV with his gun, Campos raised his gun. Campos was angry and said something to the effect of, "[W]hat the hell are you guys doing?" After Serbeck got out of the SUV, his neighbor could not see him, but he heard Serbeck say, "[H]old on a minute." Immediately after this exchange, Serbeck's neighbor heard three shots. He never heard Serbeck rack his gun.

¶11    Campos's daughter testified that she saw Campos retrieve something from a box before getting out of the SUV, but she did not see what it was. She did not see most of what followed because she was sitting in the SUV facing away from Campos and Serbeck. She heard Campos ask Serbeck and his neighbor what they were doing following his daughter and her friends, why they were "messing around with [his] daughter," "what they were doing out this late at night," and "why they were wandering the streets." They "wouldn't answer." She testified that Campos did not yell; rather, he was calm and "in control of himself." She then heard two or three shots.

¶12    One bullet struck Serbeck and he fell to the ground. The bullet entered his chest near the shoulder, punctured a lung, and severed the spinal cord on its way out, paralyzing Serbeck from the chest down. When Serbeck realized how much he was bleeding, he stuck his finger in the wound to stanch the flow. An expert witness testified that the trajectory of the bullet was consistent with Serbeck's bending over or crouching, but he could not say whether Serbeck was in fact doing so.

¶13    After Campos shot Serbeck, he pointed his gun at Serbeck's neighbor, who was still in the SUV, and told him to put his hands up and not move. Campos got his phone and called 911 to request an ambulance. He continued to point his gun at Serbeck and his neighbor, yelling to Serbeck at one point, "[D]on't be messing with the gun!" Once Campos was sure Serbeck's neighbor did not have a gun, Campos let him get out of the SUV and help Serbeck. After

Serbeck's neighbor walked around the SUV to where Serbeck was, Campos told the neighbor to kick Serbeck's gun farther away, which he did.

¶14    About the time Serbeck's neighbor got out of the SUV, a woman who had heard the commotion from a nearby house came and asked Campos if she could approach Serbeck to help. As she approached Serbeck, she used the bottom of her sandal to turn the barrel of Serbeck's gun away from Serbeck, his neighbor, and herself. She testified that she later checked the bottom of her sandals before entering her house and did not see any blood on them. Although Campos still had his gun in his hand, the woman testified that he was pointing it in the air and that he was fairly calm and "level-headed." However, she heard a female in the background screaming, "He is lying, he is lying."

¶15    After the police and emergency medical personnel arrived, Serbeck was flown to the hospital. But before he was taken, Serbeck asked an officer to make sure that the safety on his gun was engaged; he later testified that he did so because he had heard Campos tell the 911 operator that Serbeck had racked his gun. The officer confirmed that the slide safety was on. At trial, a gun expert testified that an engaged slide safety would prevent someone from racking the gun. The expert also testified, and demonstrated, that the slide safety could be engaged by directly kicking the safety. Investigators also found one bullet in the chamber of Serbeck's gun and one in the magazine, and there was some blood on the back of the handle. Two shell casings from Campos's gun were found.

¶16    At trial, Campos argued that he acted in self-defense. He asserted that he shot Serbeck only after he saw Serbeck with a gun and heard him rack it. He argued that Serbeck's safety engaged when the gun was kicked. And he argued that the blood got on Serbeck's gun because Serbeck was holding it when he was shot, and the State had provided no evidence that the blood got on the gun when Serbeck's neighbor kicked it. Campos further argued

that it was reasonable under the circumstances to point his gun at Serbeck's neighbor until he could be sure that he was unarmed.

¶17 The jury rejected Campos's self-defense argument and convicted Campos of attempted murder with injury for shooting Serbeck and aggravated assault for holding Serbeck's neighbor at gunpoint.[4] Campos was sentenced to consecutive terms of three years to life for attempted murder with injury and an indeterminate term not to exceed five years for aggravated assault. Campos challenges the convictions on appeal.

## ISSUES AND STANDARDS OF REVIEW

¶18 In challenging his conviction for attempted murder, Campos asserts three claims of ineffective assistance by his trial counsel. He contends that his trial counsel performed deficiently by (1) failing to request a special mitigation jury instruction for extreme emotional distress, (2) failing to object to a verdict form that misplaced the burden of proof for imperfect self-defense, and (3) failing to object to several statements made by the prosecutor in closing arguments. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.[5]

---

[4]The jury also convicted Campos of one count of aggravated assault against Serbeck, but the trial court later merged this conviction with the attempted murder conviction.

[5]Campos also asserts the imperfect self-defense and prosecutorial misconduct claims under the plain error doctrine. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993) (setting forth test for plain error). Given our resolution of this appeal under Campos's ineffective assistance claims, we need not address his plain error arguments.

¶19   Campos advances other challenges to his conviction for attempted murder. Because we conclude that Campos is entitled to a new trial on the basis of ineffective assistance of counsel, we do not address his remaining claims other than to provide limited guidance on remand.

¶20   Campos challenges his conviction for aggravated assault first by arguing that the trial court improperly excluded expert testimony relevant to the reasonableness of Campos's actions. "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse unless the decision exceeds the limits of reasonability." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (citations omitted); *see also State v. Maestas*, 2012 UT 46, ¶ 122, 299 P.3d 892.

¶21   Campos also challenges the aggravated assault conviction by arguing that he was entitled to a lesser included offense jury instruction on threatening with a dangerous weapon. "[W]e review a court's ruling on a proposed jury instruction for correctness . . . ." *Maestas*, 2012 UT 46, ¶ 148.

ANALYSIS

I. Ineffective Assistance of Counsel

¶22   Campos contends that he was denied a fair trial because he received ineffective assistance of counsel when his trial counsel failed to request a jury instruction on extreme emotional distress, failed to object to the verdict form, and failed to object to several instances of alleged prosecutorial misconduct.

¶23   To ensure a fair trial, the Sixth Amendment of the U.S. Constitution guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984). To succeed on a claim of ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard

of reasonableness" considering all the circumstances. *Id.* at 687–88. Furthermore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). Therefore, "we give trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996).

¶24    In addition, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

A.    Extreme Emotional Distress Instruction

¶25    Campos first contends that his trial counsel performed deficiently by failing to request a special mitigation jury instruction on extreme emotional distress.

¶26    Under the current statute, extreme emotional distress operates as a special mitigating circumstance that must be proved by a preponderance of the evidence. *See* Utah Code Ann. § 76-5-205.5 (LexisNexis 2012); *State v. Drej*, 2010 UT 35, ¶¶ 15, 19–21, 233 P.3d 476. "Special mitigation exists when the actor causes the death of another or attempts to cause the death of another . . . under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." Utah Code Ann. § 76-5-205.5(1)(b).

¶27    If the trier of fact finds that each element of attempted murder has been established beyond a reasonable doubt "and also

that the existence of special mitigation . . . is established by a preponderance of the evidence," "the defendant shall instead be found guilty of attempted manslaughter." *Id.* § 76-5-205.5(5)(a), (5)(b)(iv). However, a jury's determination on special mitigation must be unanimous. *See id.* § 76-5-205.5(6). "If the jury is unable to unanimously agree whether or not special mitigation has been established, the result is a hung jury." *Id.* § 76-5-205.5(6)(d).

¶28   Campos argues that his trial counsel's failure to request a special mitigation jury instruction for extreme emotional distress—in addition to the instructions on self-defense—was deficient because extreme emotional distress is clearly a stronger defense in this case than self-defense. The State responds that Campos's trial counsel's actions were reasonable because Campos would not have been entitled to an instruction on extreme emotional distress, and because arguing both self-defense and extreme emotional distress would have been inconsistent.

¶29   First, we note that Campos would have been entitled to an instruction on extreme emotional distress. "Each party is . . . entitled to have the jury instructed on the law applicable to its theory of the case if there is any reasonable basis in the evidence to justify it." *State v. Torres*, 619 P.2d 694, 695 (Utah 1980). Thus, if "a rational jury could find a factual basis in the evidence" to support the theory, the trial court is "'*obligated* to give the instruction.'" *State v. White*, 2011 UT 21, ¶¶ 21–22, 251 P.3d 820 (quoting *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867).

¶30   Our supreme court has explained that "a person acts under the influence of extreme emotional distress when he is exposed to extremely unusual and overwhelming stress that would cause the average reasonable person under the same circumstances to experience a loss of self-control, and be overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *Id.* ¶ 26 (citation and internal quotation

marks omitted).[6] However, the statute excludes from the purview of emotional distress "mental illness" and "distress that is substantially caused by the defendant's own conduct." Utah Code Ann. § 76-5-205.5(3). Thus, "an external triggering event is also required." *White*, 2011 UT 21, ¶ 32. "In many cases this triggering event will naturally occur just before the criminal act; however, we find no language in our precedent that *requires* the triggering event be *contemporaneous* with the defendant's loss of self-control." *Id.*

¶31    For example, in *State v. White*, the supreme court reversed our denial of an extreme emotional distress instruction. *See* 2011 UT 21, ¶ 38. There, the defendant claimed that she suffered extreme emotional distress that grew over time due to the actions of her ex-husband. *See id.* ¶¶ 2–7. She confronted him at work about financial matters, threatened to kill him, and drove away, and when she returned later, "her emotions took over and she lost all self-control" and tried to run him over with her car. *See id.* The supreme court held that such circumstances did not make the defense of extreme emotional distress unavailable as a matter of law. *Id.* ¶ 33.

¶32    The State argues that Campos "substantially caused" his own emotional distress when he retrieved his gun, drove with his daughter to find Serbeck, forced Serbeck to stop by pulling in front of him, and confronted Serbeck with his gun in hand. However, this argument ignores the initial triggering event that led Campos to take the actions described by the State: Campos's teenage daughter and her friends arrived at Campos's house in a panic after being followed late at night. By the time Campos confronted Serbeck, Serbeck testified that Campos was "[en]raged," "mad," and "screaming something about somebody following his

---

[6]Although the supreme court was applying an earlier version of the statute when it made this statement, we see nothing in the language of the amended statute that would suggest a departure from this precedent defining extreme emotional distress.

daughter."[7] Based on this evidence, a rational jury might conclude that Campos was under "extremely unusual and overwhelming stress that would cause the average reasonable person under the same circumstances to experience a loss of self-control, and be overborne by intense feelings, such as passion [and] anger." *See id.* ¶ 26 (citation and internal quotation marks omitted). That Campos could have called 911 rather than pursuing and shooting Serbeck—in other words, that Campos acted in a way that arguably exhibited "loss of self-control" and his being "overborne by intense feelings"—does not necessarily mean that Campos substantially caused his own emotional distress. Although the jury may not have ultimately concluded that Campos was acting "under the influence of extreme emotional distress" or that the circumstances presented "a reasonable explanation or excuse" for that emotional distress, *see* Utah Code Ann. § 76-5-205.5(1)(b) (LexisNexis 2012), the evidence provides some basis for such a conclusion and Campos would have been entitled to a jury instruction on extreme emotional distress had his counsel requested one.

¶33     The State argues, however, that failure to request such an instruction does not constitute deficient performance because doing so would have been inconsistent with Campos's theory of the case. The State argues that throughout the trial defense counsel presented Campos as calm and in control in an effort to strengthen its case that Campos acted reasonably for purposes of self-defense. The State thus argues that we should not second-guess defense counsel's strategic choice to pursue the self-defense theory to the exclusion of the "inconsistent" emotional distress theory.

¶34     "[A]ny election between inconsistent defenses [is] a legitimate exercise of trial strategy rather than ineffective assistance of counsel." *State v. Pascual*, 804 P.2d 553, 556 (Utah Ct. App. 1991);

---

[7]The State emphasized this evidence to the jury, referring to Campos's "rage" over a dozen times in closing arguments and asking, at one point, "Who in their right mind would do such a thing unless you are just blinded by rage?"

*see also State v. Perry*, 899 P.2d 1232, 1241 (Utah Ct. App. 1995). For example, trial counsel cannot be deemed ineffective for failing to request a jury instruction on diminished capacity when the defendant has denied all involvement in the crime. *See Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir. 1998); *see also State v. Hall*, 946 P.2d 712, 723–24 (Utah Ct. App. 1997) (rejecting ineffective assistance claim when defense counsel did not request lesser included offense instructions, because "defense counsel's request . . . would have been inconsistent with his assertion that defendant never touched [the victim]").

¶35    Here, defense counsel might have argued both self-defense and extreme emotional distress. Indeed, the two defenses are sometimes asserted together. *See, e.g., State v. Spillers*, 2007 UT 13, ¶¶ 13–23, 152 P.3d 315 (concluding that a defendant was entitled to jury instructions on self-defense, imperfect self-defense, and extreme emotional distress). Accordingly, because Campos's theory of the case supported a claim of self-defense, and the State's theory of the case supported a claim of extreme emotional distress, defense counsel might well have requested an instruction for extreme emotional distress in addition to self-defense. Campos's trial counsel could have argued to the jury that if it believed Campos's version of events, it must acquit him, but if it believed the State's version of events, it must convict him only of attempted manslaughter, not attempted murder.

¶36    However, given the "heavy measure of deference" we apply to counsel's judgments, *Strickland v. Washington*, 466 U.S. 668, 691 (1984), we cannot say that Campos's trial counsel acted unreasonably in pursuing a different trial strategy. If Campos had prevailed on self-defense, he would have been entitled to acquittal. *See* Utah Code Ann. § 76-2-402(1) (LexisNexis 2008). Extreme emotional distress would have provided the jury with a middle ground, conviction for attempted manslaughter. *See id.* § 76-5-205.5(5)(b)(iv) (2012). But Campos had already provided the jury with a middle ground—imperfect self-defense—that was consistent with his version of events. *See id.* § 76-5-203(4)(a), (c)

(2012) (providing that imperfect self-defense reduces attempted murder charge to attempted manslaughter). Trial counsel is given a wide latitude of discretion in making strategic decisions at trial, *Strickland*, 466 U.S. at 689; *State v. Tennyson*, 850 P.2d 461, 465, 468 (Utah Ct. App. 1993), and we cannot say that Campos's trial counsel acted unreasonably in this case by pursuing one middle-ground defense and choosing to forego another that was arguably inconsistent with Campos's version of events. *See Ross v. State*, 2012 UT 93, ¶¶ 31, 48, 293 P.3d 345 (suggesting that had trial counsel pursued claims of actual innocence, mistaken identity, or self-defense, the decision to forego a defense of extreme emotional distress would have been a legitimate trial strategy because the other defenses "would have undermined or conflicted with the extreme emotional distress defense").

B.      Verdict Form

¶37     Campos next challenges his trial counsel's failure to object to the verdict form's description of imperfect self-defense. Imperfect self-defense is an affirmative defense to a charge of attempted murder. Utah Code Ann. § 76-5-203(4)(a); *State v. Low*, 2008 UT 58, ¶¶ 22–24, 192 P.3d 867. This affirmative defense is available if the defendant "attempted to cause the death of another under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." Utah Code Ann. § 76-5-203(4)(a).

¶38     The prosecution is required to "disprove the existence of affirmative defenses beyond a reasonable doubt once the defendant has produced some evidence of the defense." *State v. Drej*, 2010 UT 35, ¶ 15, 233 P.3d 476 (citation and internal quotation marks omitted); *see also* Utah Code Ann. §§ 76-1-501, -502, -504 (LexisNexis 2012). Therefore, once a defendant has produced some evidence of imperfect self-defense, the prosecution is required to disprove imperfect self-defense beyond a reasonable doubt. If the prosecution does not meet this burden, the charge of attempted

murder is reduced to attempted manslaughter. *See* Utah Code Ann. § 76-5-203(4)(c).

¶39    In the present case, the jury was given a verdict form for the charge of attempted murder with injury. The form read as follows:

> We, the jurors in the above case, unanimously find the defendant, Reginald Campos:
>
> _____        Guilty beyond a reasonable doubt of Attempted Murder with Injury;
>
> _____        Not guilty of Attempted Murder with Injury.
>
> ONLY if you find the Defendant, Reginald Campos, guilty of Attempted Murder with Injury, then answer the following:
>
> _____        We find, *beyond a reasonable doubt*, that the defense of Imperfect Self Defense *applies* in this case;
>
> _____        We find, beyond a reasonable doubt, that the defense of Imperfect Self Defense does not apply in this case.

(Emphasis added.) Campos argues that by asking the jury whether it found beyond a reasonable doubt that the affirmative defense *applied*, the verdict form effectively shifted the burden of proof from the State to Campos.

¶40    The State concedes only that the verdict form contained "less-than-clear language." The State suggests that the form was not erroneous, because it did not state or imply that *the defendant* bore the burden to prove that imperfect self-defense applied. We disagree.

¶41    The fundamental problem with the verdict form used in this case is that it requires an affirmative defense to be established beyond a reasonable doubt. This is contrary to Utah law. A defendant need only produce enough evidence to raise a reasonable basis for the affirmative defense. *See State v. Sellers*, 2011 UT App 38, ¶ 16, 248 P.3d 70. "Once that initial showing is made, the burden shifts to the state to prove to the jury, beyond a reasonable doubt, that the defense lacks merit." *Id.* In other words, once a defendant—or even the prosecution for that matter—has produced enough evidence to warrant the giving of an instruction on an affirmative defense, the defendant is entitled to acquittal or, as in the case of imperfect self-defense, reduction of the charge unless the prosecution carries its burden of *disproving* the defense beyond a reasonable doubt. *See State v. Knoll*, 712 P.2d 211, 214–15 (Utah 1985); *Sellers*, 2011 UT App 38, ¶¶ 15, 17; *see also* Utah Code Ann. § 76-5-203(4)(c). Thus, a jury may reduce an attempted murder charge to attempted manslaughter "even though the evidence of [imperfect] self-defense fell 'far short of establishing the [defense] by a preponderance of the evidence upon the subject.'" *See Knoll*, 712 P.2d at 214 (quoting *State v. Vacos*, 120 P. 497, 502 (Utah 1911)).

¶42    Because "the burden of proof required for affirmative defenses is counter-intuitive," *State v. Garcia*, 2001 UT App 19, ¶ 16, 18 P.3d 1123, the prosecution's responsibility "should [be] made plain to the jury," *State v. Torres*, 619 P.2d 694, 695 (Utah 1980). "When the defendant has reached the threshold to merit self-defense instructions, those instructions must clearly communicate to the jury what the burden of proof is *and* who carries the burden." *Garcia*, 2001 UT App 19, ¶ 16 (emphasis added); *see also State v. Hansen*, 734 P.2d 421, 428–29 (Utah 1986) (plurality opinion) (stating that "[t]he proper course would be for the court to explicitly state that the defendant has no particular burden of proof" regarding an affirmative defense because even when a jury instruction "does not expressly shift the burden of proof to the defendant," it "can be misleading and may well raise

the inference that the burden is on the defendant"). "[F]ailure to adequately instruct the jury 'concerning the burden of proof as to self-defense,' is reversible error and requires a new trial." *Garcia*, 2001 UT App 19, ¶ 18 (quoting *Torres*, 619 P.2d at 696). The duty to properly instruct the jury applies to the verdict form. *See Hart v. Salt Lake County Comm'n*, 945 P.2d 125, 136 (Utah Ct. App. 1997).

¶43    Here, sufficient evidence was presented to warrant a jury instruction on imperfect self-defense. The judge gave a jury instruction on imperfect self-defense, and the instruction properly described the burden of proof. However, the verdict form directly contradicted that instruction by asking the jury to find either that the affirmative defense had been disproved beyond a reasonable doubt, or that it had been *proved beyond a reasonable doubt*. This was error.

¶44    Campos's trial counsel did not object to the verdict form, and in fact proposed a similarly flawed form—as did the prosecution. Campos therefore argues that he was deprived of his constitutional right to effective assistance of counsel. To show that his trial counsel's assistance "fell below an objective standard of reasonableness," Campos "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 687–89 (1984) (citation and internal quotation marks omitted).

¶45    As stated above, the verdict form was fundamentally flawed. Once it had been established that an imperfect self-defense instruction was warranted, "[i]t was . . . [Campos's] trial counsel's responsibility to ensure that it be made plain to the jury that [Campos] did not bear any further burden of proof on the matter and that, rather, the State alone had the responsibility to disprove his defense beyond a reasonable doubt." *See Sellers*, 2011 UT App 38, ¶ 17 (citation and internal quotation marks omitted). Campos's trial counsel thus had a duty to ensure that the jury was clearly and properly instructed on the burden of proof relevant to imperfect self-defense. The State has not argued that failure to fulfill that duty may be considered sound trial strategy, and we do not see

how it could be. *See State v. Moritzsky*, 771 P.2d 688, 690, 692 (Utah Ct. App. 1989) (rejecting state's claim that defense counsel's request of an erroneous jury instruction on an affirmative defense could be justified as a tactical decision, given "[t]he lack of any conceivable tactical basis" for defense counsel's actions). Therefore, Campos's trial counsel's failure to object to the verdict form fell below an objective standard of reasonableness. *See Sellers*, 2011 UT App 38, ¶ 17; *Moritzsky*, 771 P.2d at 692.

¶46   To demonstrate that he is entitled to relief on appeal, Campos must show not only that his trial counsel performed deficiently, but also that he was prejudiced by his trial counsel's deficient performance. *See Strickland*, 466 U.S. at 694. We will address the prejudice relevant to the verdict form in conjunction with the next allegation: prosecutorial misconduct.

C.     Prosecutorial Misconduct

¶47   Campos challenges his trial counsel's failure to object to several statements made by the prosecutor in closing arguments. While most of the statements Campos challenges do not rise to the level of prosecutorial misconduct, two statements do.

1.     Unfairly appealing to the sympathies and passions of the jury

¶48   The prosecutor began his closing remarks by stating that this case was about "civilized society," "[s]ociety versus the man who takes the law into his own hands. It's society versus the self-appointed accuser and self-appointed judge." He returned to this theme in his final words to the jury:

> [O]ur whole system of law is based on the concept of justice. Which simply means when you commit a crime like this, when you gun down your fellow neighbor in the most tragic of ways, stealing from him his ability to run, his ability to bike, his ability to

walk his daughter down the aisle, when you do
something like that on the streets of our community
then you should be held accountable. Hold Mr.
Campos accountable for his actions and to do that,
find him guilty on all counts.

¶49   Campos argues that these statements were inflammatory
and inappropriately appealed to passion and prejudice. He argues
that the statements prompted the jury to put themselves in the
shoes of the victim and to consider matters outside the evidence.
The State responds that the prosecutor was entitled to make a plea
that justice be done and that Campos be held accountable for his
actions: "[T]he prosecutor's argument legitimately [implied] that
Defendant's conduct was that of a vigilante and that society,
represented by the jury, should hold responsible a person who
unlawfully takes matters into his own hands and harms another
person in the process." We agree with Campos.

¶50   To determine whether a prosecutor's remarks are "so
objectionable as to merit a reversal," we must determine whether
the remarks "call to the attention of the jurors matters which they
would not be justified in considering in determining their verdict."
*State v. Valdez*, 513 P.2d 422, 426 (Utah 1973); *accord State v. Todd*,
2007 UT App 349, ¶¶ 15–16, 173 P.3d 170. "Counsel for both sides
have considerable latitude in their arguments to the jury . . . ."
*Valdez*, 513 P.2d at 426. However, a prosecutor "exceed[s] the
bounds of propriety" when he or she "unfairly appeals to the
sympathies," "passions and prejudices of the jury." *Todd*, 2007 UT
App 349, ¶¶ 19–20 (citations and internal quotation marks
omitted). "[T]he determination of guilt must *not* be the product of
fear or vengeance but rather intellectually compelled after a
disinterested, impartial and fair assessment of the testimony that
has been presented." *Id.* ¶ 21 (citation and internal quotation marks
omitted). Such arguments are inappropriate because they "divert
the jury from its duty to decide the case on the evidence." *Id.* ¶ 18
(citation and internal quotation marks omitted).

¶51    Applying these standards, our courts have held that "a prosecutor is prohibited from asking jurors to put themselves in the victim's place," *see id.* ¶ 19, or suggesting "that the jury has a duty to protect the alleged victim—to become her partisan," *see State v. Wright*, 2013 UT App 142, ¶ 41. Furthermore, "reference to the jury's societal obligation" is inappropriate when it suggests that the jury base its decision on the impact of the verdict on society and the criminal justice system rather than the facts of the case. *See State v. Dunn*, 850 P.2d 1201, 1224 (Utah 1993); *State v. Smith*, 700 P.2d 1106, 1112 (Utah 1985).

¶52    Here, the prosecutor's comments called attention to matters the jury should not have considered in reaching its verdict. We are most troubled by the prosecutor's reference to Campos's "stealing from [Serbeck] his ability to run, his ability to bike, his ability to walk his daughter down the aisle." The statement was a direct appeal to the passions of the jury. It suggested to the jury that it should find Campos guilty out of vengeance or sympathy for the victim rather than based on what the facts and the law required.

¶53    Taken as a whole, the prosecutor's statements in the present case constituted prosecutorial misconduct. The prosecutor appealed to the passions of the jury and the jury's duty to society to argue that Campos should be found guilty because of the tragic consequences suffered by Serbeck. The jury's guilty verdict must be based on an impartial determination that the State proved each element of the charged crimes beyond a reasonable doubt, *see Todd*, 2007 UT App 349, ¶ 21, and disproved each affirmative defense beyond a reasonable doubt, *see State v. Drej*, 2010 UT 35, ¶ 15, 233 P.3d 476. It must not be based on a desire to punish the defendant because of the victim's tragic loss of "his ability to run, his ability to bike, his ability to walk his daughter down the aisle."

2.    Personal attack on defense counsel

¶54    Campos also challenges several statements where the prosecutor compared the defense's theory of the case to a red

herring and suggested that defense counsel was being deceitful. The State responds that the prosecutor's statements "'were not directed at defense counsel personally, but rather were comments on the defense theories.'" (Quoting *State v. Norton*, 254 P.3d 77, 90 (Idaho Ct. App. 2011) (holding that a prosecutor's description of some of defense counsel's arguments as red herrings and smoke and mirrors was not inappropriate).) We agree with Campos that the statements in this case were inappropriate.

¶55    In closing arguments, the prosecutor began his rebuttal by discussing at length the idiom of a red herring as "a technique to confuse or distract." In applying the idiom to this case, the prosecutor stated, "And is there any relationship with a red herring and the defense in this case? They would have you believe an almost unbelievable story. Why? Simply to confuse and distract. . . . Why would they do that? Just a red herring. A ploy to confuse and distract."

¶56    As noted above, the basic test for prosecutorial misconduct is whether the statements "call to the attention of the jurors matters which they would not be justified in considering in determining their verdict." *State v. Valdez*, 513 P.2d 422, 426 (Utah 1973). "Accordingly, '[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.'" *State v. Todd*, 2007 UT App 349, ¶ 18, 173 P.3d 170 (alteration in original) (quoting ABA Standards for Criminal Justice: Prosecution Function and Defense Function 3-5.8(d) (3d ed. 1993)). A prosecutor diverts the jury from its duty to decide the case on the evidence when he is "permitted to make unfounded and inflammatory attacks on the opposing advocate." *United States v. Young*, 470 U.S. 1, 9 (1985). Thus, remarks intended to "disparage the defense or otherwise impugn the forthrightness of the defense strategy" constitute misconduct. *See State v. Cummins*, 839 P.2d 848, 854 (Utah Ct. App. 1992) (citation and internal quotation marks omitted); *see also Young*, 470 U.S. at 9 ("'A personal attack by the prosecutor on defense counsel is improper.'" (quoting ABA Standards for Criminal Justice 4-7.8 (2d ed. 1980))). However,

referring to defense counsel's theory as a red herring would not be inappropriate so long as the reference could be classified as a comment on the strength of "the evidence and the inferences and deductions arising therefrom," *see State v. Tillman*, 750 P.2d 546, 560 (Utah 1987); *State v. Parsons*, 781 P.2d 1275, 1284 (Utah 1989).

¶57 The prosecutor's comments here crossed the line from permissible argument of the evidence to an impermissible attack on defense counsel's character. The prosecutor argued not only that the claim of self-defense was a *distraction*, but also that it was a *technique* or *ploy* to confuse and distract the jury. That is, the prosecutor argued that defense counsel *intended* to mislead the jury. Arguing that the evidence does not support the defense theory and that the theory is thus a distraction from the ultimate issue is fundamentally different from arguing that defense counsel is intentionally trying to distract and mislead the jury. *Cf. State v. Harmon*, 956 P.2d 262, 275–77 (Utah 1998) (Russon, J., with one justice concurring and three justices concurring in the result) (suggesting that impugning defense counsel's character and wrongly accusing defense counsel of misleading witnesses constitute prosecutorial misconduct).

3.    Deficient performance

¶58 Campos argues that his trial counsel's failure to alert the trial court to both instances of prosecutorial misconduct "fell below an objective standard of reasonableness" and thus constituted deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). We agree. The inappropriate and unchecked appeal to the sympathy of the jury created a "risk that jurors [would] feel obligated to seek revenge for the victim." *See Todd*, 2007 UT App 349, ¶ 21. The suggestions that defense counsel was intentionally misleading the jury exacerbated "the possibility that the jury [would] give special weight to the prosecutor's arguments." *Id.* ¶ 17 (citation and internal quotation marks omitted). Such misconduct thus merited action on the part of defense counsel.

¶59    Furthermore, the two instances of prosecutorial misconduct book-ended the prosecutor's rebuttal argument, which opened with the red herring reference and closed with the appeal to the jury's sympathy for Serbeck. Campos's trial counsel thus did not have an opportunity to counter the statements through argument to the jury. We acknowledge that "interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously." *Young*, 470 U.S. at 13. However, in this case, "[a]t the very least, a bench conference might have been convened out of the hearing of the jury . . . and an appropriate instruction given." *See id.* at 13–14. Defense counsel's failure to request such a remedy or otherwise object constituted deficient performance.

¶60    Campos must also establish that his counsel's failure to at least request a curative instruction prejudiced his case. While these two instances of unchallenged prosecutorial misconduct may not be sufficiently prejudicial on their own to require reversal, they must also be viewed in the context of the improper verdict form. We thus turn to the issue of cumulative prejudice.

D.    Cumulative Prejudice

¶61    Each of the three instances of deficient performance identified above requires a showing of prejudice to merit reversal. *See Strickland*, 466 U.S. at 687; *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993); *State v. Troy*, 688 P.2d 483, 486 (Utah 1984). Under the doctrine of cumulative prejudice, we will reverse "if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *Dunn*, 850 P.2d at 1224 (omission in original) (citation and internal quotation marks omitted). Campos argues that taken together, the cumulative effect of his trial counsel's lapses was sufficiently prejudicial to warrant reversal. We agree.

¶62    The State argues that the error on the verdict form could not be prejudicial because the prosecution and defense each informed the jury in closing arguments that the State bore the burden of

disproving self-defense beyond a reasonable doubt. However, we do not agree that these statements rendered the error harmless. The jury was expressly instructed to ignore anything in counsel's closing arguments that conflicted with the jury instructions: "If they say anything about the law that conflicts with these instructions, you are to rely on these instructions." "In the absence of any circumstances suggesting otherwise, courts presume that the jury follows such instructions." *State v. Wright*, 2013 UT App 142, ¶ 42 (citing *State v. Menzies*, 889 P.2d 393, 401 (Utah 1994)). "A special verdict form is a jury instruction . . . ." *Hart v. Salt Lake County Comm'n*, 945 P.2d 125, 136 (Utah Ct. App. 1997). Therefore, counsel's closing arguments did not cure the error in the verdict form.

¶63    The State also argues that the error on the verdict form could not be prejudicial because several other instructions correctly informed the jury of the burden of proof. Most of the instructions cited by the State simply state that the prosecution bears the burden of proof or that guilt must be established beyond a reasonable doubt. The instruction most relevant to the issue of prejudice is the instruction on imperfect self-defense, which clearly and correctly stated that a reduction of the charge to attempted manslaughter is required if the State fails to meet its burden:

> The defendant is not required to prove that the defense applies. Rather, the State must prove beyond a reasonable doubt that the defense does not apply. The State has the burden of proof at all times. If the State has not carried this burden, the defendant may only be convicted of attempted manslaughter.

¶64    The State is correct that, when reviewing an alleged error in the jury instructions, "we look at the jury instructions in their entirety." *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (citation and internal quotation marks omitted). "[I]f taken as a whole they fairly instruct the jury on the law applicable to the case, the fact that one of the instructions, standing alone, is not as accurate as it

might have been is not reversible error." *State v. Lucero*, 866 P.2d 1, 3 (Utah Ct. App. 1993); *see also Maestas*, 2012 UT 46, ¶ 148. However, "where instructions are in irreconcilable conflict, or so conflicting as to confuse or mislead the jury, the rule requiring instructions to be read together has no application." *State v. Green*, 6 P.2d 177, 183 (Utah 1931) (citation and internal quotation marks omitted); *accord State v. Hendricks*, 258 P.2d 452, 453 (Utah 1953) (per curiam). Thus, given the direct conflict between the imperfect self-defense instruction and the verdict form in this case, we cannot say that the jury was fairly instructed on the applicable law, even in light of the numerous more general statements in the instructions about burdens of proof. As noted above, the counterintuitive burden allocation for affirmative defenses requires the trial court to clearly communicate the law to the jury on this point. *See State v. Garcia*, 2001 UT App 19, ¶ 16, 18 P.3d 1123.

¶65    Conflict between jury instructions and a verdict form may be deemed harmless in some circumstances. *See Parsons v. Barnes*, 871 P.2d 516, 529–30 (Utah 1994). But when "it cannot be told which instruction was followed by the jury, or what influence the erroneous instruction had on their deliberations," "the giving of inconsistent instructions is error and sufficient ground for a reversal of the judgment." *Green*, 6 P.2d at 183–84 (citation and internal quotation marks omitted).

¶66    In the context of this case, we do not believe the error was harmless. Although the verdict form correctly speaks in terms of the jury's finding "beyond a reasonable doubt, that the defense of Imperfect Self Defense does not apply in this case," the jury's other option on this question was to find "*beyond a reasonable doubt*, that the defense of Imperfect Self Defense applies in this case." (Emphasis added.) The jury's level of certainty may well have been influenced by a belief that to reach the opposite conclusion, they had to be convinced beyond a reasonable doubt. The likelihood that the jury was actually misguided and would have reached a different result with a proper verdict form is increased when this

error is considered in conjunction with the prosecutorial misconduct.

¶67　In determining whether a prosecutor's inappropriate statements prejudiced the defendant, we consider whether, "under the circumstances of the particular case," the jury was "probably influenced by those remarks," *State v. Valdez*, 513 P.2d 422, 426 (Utah 1973), "such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant," *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987). In determining whether the jury was probably influenced by the inappropriate comments, we consider the strength of the evidence supporting a defendant's guilt and the strength of the conflicting evidence:

> If proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial. Likewise, in a case with less compelling proof, this Court will more closely scrutinize the conduct. If the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations, there is a greater likelihood that they will be improperly influenced through remarks of counsel.

*State v. Troy*, 688 P.2d 483, 486 (Utah 1984) (citation and internal quotation marks omitted). Our supreme court explained the rationale for such an approach by noting that in cases where the jury had to weigh conflicting evidence or evidence susceptible of differing interpretations, "the jurors may be searching for guidance in weighing and interpreting the evidence. They may be especially susceptible to influence, and a small degree of influence may be sufficient to affect the verdict." *Id.*

¶68　At trial, Campos did not contest the fact that he shot Serbeck. Rather, he argued that he acted in self-defense. One version of events supported by the evidence is that after Campos

stopped Serbeck, Campos got out of the SUV with his gun in his back pocket. He drew his gun when he heard Serbeck rack his own weapon and saw Serbeck starting to raise it. Serbeck dropped his gun when Campos shot him, and the safety engaged when Serbeck's neighbor kicked the gun out of the way.

¶69 Another version of events supported by the evidence—and apparently accepted by the jury—is that Serbeck racked his gun at home and put the safety on before putting the gun in his SUV. When Campos stopped Serbeck, Campos got out of the SUV with his gun drawn, and Serbeck followed suit. Soon, however, Serbeck put his gun down on the ground, and Campos shot him as he was rising up.

¶70 The State's medical expert testified that Serbeck's wounds were consistent with his being shot while bent over or crouching. The expert acknowledged, however, that he could not say whether Serbeck was in fact crouching. Other circumstantial evidence presented at trial also could be read to support either version of events: the bullet in the chamber of Serbeck's gun, the positioning of the gun on the ground, the engaged safety mechanism, and the blood on the gun.

¶71 In other words, "the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations." *Troy*, 688 P.2d at 486. Such situations involve "a greater likelihood that [the jury] will be improperly influenced through remarks of counsel." *Id.* We believe the likelihood is even greater here in light of the conflicting instructions to the jury on the issue of imperfect self-defense. To reduce the charge to attempted manslaughter, the verdict form required the jury to find beyond a reasonable doubt that Campos had a reasonable belief that he was legally justified in shooting Serbeck. However, the jury was required by law to reduce the charge *unless* it found that the State had proved beyond a reasonable doubt that Campos did not have such a belief. *See supra* ¶¶ 38, 41–42. Given the conflicting evidence that the jury had to

weigh and the erroneous statement of the burden of proof, we believe it is likely that the jury was improperly influenced by the prosecution's appeal to their sympathies and the accusations that defense counsel was intentionally trying to mislead them.

¶72   Viewing the cumulative effect of trial counsel's errors that we have identified, our confidence in the verdict for the attempted murder charge is undermined. We therefore reverse the conviction for attempted murder.[8]

II. Expert Testimony Relevant to the Aggravated Assault Charge

¶73   Campos challenges his aggravated assault conviction by contending that the trial court abused its discretion when it excluded expert testimony relevant to self-defense.

¶74   The State moved to exclude Campos's expert. The expert intended to testify that if a police officer were in Campos's situation, having shot one individual and facing a second individual who may or may not be armed, standard police safety training would teach the officer to hold his gun on the second individual until the scene was secure. Campos intended to offer this evidence in support of his argument that he acted in self-defense, and that his actions were reasonable, when he pointed his gun at Serbeck's neighbor. The trial court granted the State's

---

[8]Our ruling is limited to the conviction for attempted murder. Imperfect self-defense is available only as a defense to a charge of murder or attempted murder. *See* Utah Code Ann. § 76-5-203(4)(a) (LexisNexis 2012). Although the prosecutorial misconduct we have identified could possibly be construed broadly to relate to the verdict on the aggravated assault directed toward Serbeck's neighbor, the prosecutorial misconduct is not sufficiently prejudicial in this case to warrant reversal without the added deficient performance related to the verdict form for the attempted murder charge.

motion on several grounds, including that the expert testimony would not be helpful to the jury.

¶75    Rule 702 of the Utah Rules of Evidence allows for the admission of expert testimony "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702.[9] Thus, "[u]nder rule 702, the question that must be posed prior to the admission of any expert evidence is whether, on balance, the evidence will be helpful to the finder of fact." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993) (citation and internal quotation marks omitted); *see also State v. Maestas*, 2012 UT 46, ¶ 156, 299 P.3d 892. "Expert testimony is helpful when the subject is not within 'the knowledge or experience of the average individual.'" *Balderas v. Starks*, 2006 UT App 218, ¶ 27, 138 P.3d 75 (quoting *Larsen*, 865 P.2d at 1361). However, the issue need not be "so erudite or arcane that the jurors could not possibly understand it without the aid of expert testimony." *Larsen*, 865 P.2d at 1361. Furthermore, "'[t]his "helpfulness standard" also implicates Rule 403 considerations, since if the evidence is confusing or unfairly prejudicial it will hinder rather than aid jury decision making.'" *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 86, 65 P.3d 1134 (quoting Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 7–9 (1996)), *rev'd on other grounds*, 538 U.S. 408 (2003); *see also id.* (noting that because "'Rule 403 is not being applied directly, . . . the question is "helpfulness," not whether the probative value is greatly outweighed by confusion or prejudice'" (quoting Kimball & Boyce, *Utah Evidence Law* 7–9)); *State v. Rimmasch*, 775 P.2d 388, 398 n.8 (Utah 1989).

¶76    To succeed on a self-defense claim, Campos would have to establish that he "reasonably believe[d] that force [was] necessary

---

[9]The Utah Rules of Evidence were amended in 2011. Because the changes were stylistic only, throughout this opinion we cite the current version of the rules for convenience. *See* Utah R. Evid. 702, 2011 advisory committee note.

to defend himself or a third person against [Serbeck's neighbor's] imminent use of unlawful force." *See* Utah Code Ann. § 76-2-402(1) (LexisNexis 2008). One factor the jury could consider in determining the reasonableness of Campos's belief was "the nature of the danger" Campos allegedly faced. *See id.* § 76-2-402(5)(a). Although the average juror would not have had direct experience with the situation Campos faced, the average Utah juror arguably has the requisite knowledge of handguns to assess the danger of the situation and the reasonableness of Campos's belief that force was necessary to defend himself. Furthermore, testimony about police standards had at least some potential to confuse the issues when the jury was tasked to decide the reasonableness of Campos's belief from the standpoint of a reasonable civilian (not a peace officer) under the circumstances. Although the trial court was not required to exclude the expert testimony on the basis that it was not helpful, we cannot say that doing so exceeded the limits of reasonability.[10]

### III. Lesser Included Offense Jury Instruction for Threatening with a Dangerous Weapon

¶77    Campos contends that the trial court erred by denying his request for an instruction on threatening with a dangerous weapon as a lesser included offense for his aggravated assault charge. The State responds that the evidence does not provide a rational basis for a verdict acquitting Campos of aggravated assault and convicting him of the lesser included offense.[11]

---

[10]Because we affirm on this point, we need not address the other grounds of the trial court's ruling to exclude the expert testimony.

[11]Campos asserts that threatening with a dangerous weapon is also a lesser included offense of attempted murder. However, Campos has cited no authority for this claim and has made no attempt to analyze the statutory elements to support it.

(continued...)

¶78 To obtain an instruction on a lesser included offense, "a defendant must show (1) that the charged offense and the lesser included offense have overlapping statutory elements and (2) that the evidence 'provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'" *State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788 (quoting *State v. Baker*, 671 P.2d 152, 159 (Utah 1983)); *see also* Utah Code Ann. § 76-1-402(3), (4) (LexisNexis 2012). The parties agree that the first element of the test is met here. Our supreme court held in *State v. Oldroyd* that threatening with a dangerous weapon qualifies as a lesser included offense of aggravated assault. *See* 685 P.2d 551, 554 (Utah 1984). Thus, the remaining question is whether the evidence presented at trial provides a rational basis for acquitting Campos of aggravated assault and convicting him of threatening with a dangerous weapon.

¶79 In undertaking this analysis, we "must only decide whether there is a sufficient quantum of evidence presented to justify sending the question to the jury." *Baker*, 671 P.2d at 159. "[W]hen the evidence is ambiguous and therefore susceptible to alternative interpretations, and one alternative would permit acquittal of the greater offense and conviction of the lesser, a jury question exists and the court must give a lesser included offense instruction at the request of the defendant." *Id.* Furthermore, we "view[] the evidence in the light most favorable to the defendant requesting the instruction." *Powell*, 2007 UT 9, ¶ 27.

¶80 Campos discusses the evidence adduced at trial, arguing that it is ambiguous. Yet he does not apply the evidence to the statutory elements of aggravated assault and the lesser included

---

[11](...continued)
Therefore, Campos has not carried his burden on appeal of demonstrating that he was entitled to an instruction on this point. *See* Utah R. App. P. 24(a)(9); *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

offense. Without doing so, he cannot demonstrate that the jury reasonably could have acquitted him of aggravated assault and convicted him of threatening with a dangerous weapon. It is not enough simply that the evidence be susceptible to alternative interpretations in the general sense. Rather, the evidence must be "susceptible to alternative interpretations" with respect to specific elements, which "would permit acquittal of the greater offense and conviction of the lesser." *See Baker*, 671 P.2d at 159. Thus, Campos has not carried his burden on appeal to demonstrate that the trial court's ruling was erroneous. *See State v. Robison*, 2006 UT 65, ¶ 21, 147 P.3d 448 (noting that the appellant bears the burden of persuasion on appeal and that an appellate court will not "do the heavy lifting" for the appellant); *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

## IV. Issue Related to the Attempted Murder Charge That May Arise on Remand

¶81  Having reversed Campos's conviction for attempted murder, we need not resolve his remaining claims of error relevant to that offense. However, we address one related issue that the parties have fully briefed and that is likely to arise on remand. *See generally State v. James*, 819 P.2d 781, 795 (Utah 1991).

¶82  Campos contends that the trial court improperly excluded character evidence. Campos argues that he should have been allowed to cross-examine Serbeck about specific instances that would have exhibited Serbeck's character for untruthfulness and violence. Campos also argues that a character witness who testified at trial should have been allowed to testify about specific instances that would have exhibited Serbeck's character for violence. These specific instances included multiple lies and instances of Serbeck's brandishing his handguns and making threats.[12]

---

[12]The specific instances demonstrating a violent character that Campos sought to admit included allegations of Serbeck

(continued...)

¶83 The trial court ruled that evidence of Serbeck's propensity for violence could be admitted in the form of opinion and reputation testimony but that specific instances would be irrelevant and thus inadmissible. The court also allowed character witnesses to offer opinion and reputation testimony as to Serbeck's character for untruthfulness. But the court appears to have excluded inquiry into any specific instances probative of Serbeck's character for untruthfulness, even on cross-examination of Serbeck.

¶84 Campos argues that evidence of Serbeck's prior lies and violent actions should be admitted under rule 404(b) of the Utah Rules of Evidence. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). By its terms, this general rule does not apply when evidence of a crime, wrong, or other act is used for some purpose other than proving that "the person acted in conformity with the character." *See id.* Therefore, "[t]his evidence may be admissible for another purpose, such as proving motive,

---

[12](...continued)

having "a habit of always carrying two loaded pistols under his arms" and brandishing these weapons on three occasions. Two of these instances occurred in a public restaurant. The third occurred when Serbeck threatened a woman who had just ended a relationship with him; as she was leaving, he opened his jacket, pointed to his firearms, and moved his index finger to his lips. In connection with a motion for new trial, Campos also proffered allegations that Serbeck made death threats against multiple women.

The specific instances demonstrating an untruthful character that Campos sought to admit included allegedly impersonating a U.S. marshal on two occasions and lying to women that he had worked as a mafia hit man, that he had been diagnosed with terminal cancer, and that he owned the company he worked for.

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). For such evidence to be admissible, the trial court must scrupulously examine the evidence to determine "whether it is genuinely being offered for a proper, non-character purpose," *State v. Verde*, 2012 UT 60, ¶¶ 17–18, 296 P.3d 673; whether the evidence is relevant to that non-character purpose, *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 19, 6 P.3d 1120; and whether the evidence meets the requirements of rule 403, "excluding the bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose," *Verde*, 2012 UT 60, ¶ 18. *See also Nelson-Waggoner*, 2000 UT 59, ¶¶ 16, 18–20; *State v. Decorso*, 1999 UT 57, ¶¶ 20–23, 993 P.2d 837.

¶85 On appeal, Campos fails to explain how evidence of Serbeck's prior lies and violent actions serves a non-character purpose. Indeed, in arguing that such evidence is relevant, Campos emphasizes that the evidence is "highly probative" *because* it would establish Serbeck's "propensity for violence" and make it more probable that Serbeck lied on the witness stand. To establish that specific evidence is admissible under rule 404(b), Campos must show that the evidence "has independent relevance that does not depend on . . . propensity." *See* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 189–90 (2012) (internal quotation marks omitted); *see also Decorso*, 1999 UT 57, ¶ 22. He has not done so.

¶86 Because Campos has not established that the evidence was offered for a non-character purpose, its admission is governed by rules 404(a), 405, and 608 of the Utah Rules of Evidence. "Rule 404(a) of the Utah Rules of Evidence acts as a general bar to '[e]vidence of a person's character . . . for the purpose of proving action in conformity therewith on a particular occasion.'" *State v. Leber*, 2009 UT 59, ¶ 13, 216 P.3d 964 (omission in original) (quoting a prior but substantively similar version of rule 404(a)); *see also* Utah R. Evid. 404(a)(1); *id.* R. 404(b)(1). One exception to this general rule "allow[s] an accused to offer evidence of a 'pertinent

trait of character' either of himself or of an alleged victim." *Leber*, 2009 UT 59, ¶ 13 (quoting a prior but substantively similar version of rule 404(a)). A victim's propensity for violence is "pertinent" to self-defense under this exception and is therefore admissible under rule 404(a). *See* Utah R. Evid. 404(a)(2)(B); *Leber*, 2009 UT 59, ¶¶ 13, 15 n.3.

¶87  "Once character evidence is deemed admissible under rule 404(a), the methods of proving character are limited by rule 405." *Leber*, 2009 UT 59, ¶ 13. Rule 405(a) generally limits character evidence to "testimony about the person's reputation" and "testimony in the form of an opinion." Utah R. Evid. 405(a). However, "[o]n cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." *Id.* Thus, "[r]eputation and opinion witnesses may only be asked about specific instances of conduct on cross-examination for the purpose of challenging the credibility of the reputation or opinion testimony." *Leber*, 2009 UT 59, ¶ 20. "On the other hand, rule 405(b) allows for proof of character through the use of '[s]pecific instances of conduct,'" but "only where character is an 'essential element of a charge, claim, or defense.'" *Id.* ¶ 13 (quoting a prior but substantively similar version of rule 405(b)). "However, 405(b) seldom applies in criminal cases, and 'self defense does not place . . . character at issue.'" *Leber*, 2009 UT 59, ¶ 23 (omission in original) (quoting R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 190 (2009)); *see also United States v. Talamante*, 981 F.2d 1153, 1156 (10th Cir. 1992) (noting that "use of evidence of a victim's violent character to prove that the victim was the aggressor is circumstantial use of character evidence," and "[w]hen character evidence is used circumstantially to create an inference that a person acted in conformity with his or her character," character is not at issue for purposes of the substantively similar Federal Rule of Evidence 405(b)).

¶88  Because a defendant's or victim's violent character is "pertinent" to self-defense under rule 404(a) but not "at issue"

under rule 405(b), *see Leber*, 2009 UT 59, ¶¶ 15 n.3, 23, evidence is limited to reputation and opinion testimony on direct examination, and inquiry into relevant specific instances on cross-examination. *See* Utah R. Evid. 404(a); *id.* R. 405. However, inquiry into specific instances on cross-examination is limited to "character witness[es]"—that is, witnesses who offer "testimony about the person's reputation" or "testimony in the form of an opinion" relevant to the pertinent character trait. *See id.* R. 405(a); *Leber*, 2009 UT 59, ¶ 20 & nn.4–5.

¶89    In the present case, therefore, Campos was free to present witnesses to offer reputation or opinion testimony as to Serbeck's character for violence. But, as the trial court correctly noted, Campos could not use his character witnesses to provide testimony of specific instances showing Serbeck's character for violence. Nor could Campos cross-examine Serbeck about such specific instances, because Serbeck did not testify as a character witness concerning his own character for peacefulness. *Cf. Leber*, 2009 UT 59, ¶ 20 n.5 ("[I]f an accused offers evidence of his own 'pertinent trait of character,' under rule 404(a)(1), then the prosecution may cross-examine him and inquire about specific instances of conduct to discredit his own reputation testimony.").

¶90    Another exception to rule 404(a)'s general bar to character evidence appears in rule 608, which allows evidence of a witness's character for untruthfulness and, when a witness's character for truthfulness has been attacked, evidence of a witness's character for truthfulness. Utah R. Evid. 404(a)(3); *id.* R. 608. However, like evidence of a defendant's or victim's "pertinent trait," *see id.* R. 404(a), evidence of a witness's character for truthfulness or untruthfulness is generally limited to "testimony about the witness's reputation" and "testimony in the form of an opinion," *id.* R. 608(a). *See also State v. Rimmasch*, 775 P.2d 388, 391 (Utah 1989). With a few exceptions, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Utah R. Evid. 608(b); *see also id.* R. 608(c); *id.* R. 609; *State v. Hackford*, 737 P.2d 200,

202–03 (Utah 1987). "But the court *may*, on cross-examination, allow [specific instances] to be inquired into if they are probative of the character for truthfulness or untruthfulness of (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." Utah R. Evid. 608(b) (emphasis added). In determining whether to allow cross-examination into specific instances of conduct, the trial court should determine the relevance of the specific instances to the issue of credibility, *see id.*, and "apply the overriding safeguards of rule 403" of the Utah Rules of Evidence, *State v. Gomez*, 2002 UT 120, ¶¶ 33–34, 63 P.3d 72 (citation and internal quotation marks omitted). Unlike rule 405(a), rule 608 does not limit specific-instance inquiry on cross-examination to "character witness[es]." *Compare* Utah R. Evid. 405(a), *with id.* R. 608(b).

¶91     In the present case, therefore, Campos was appropriately allowed to present character witnesses to give opinion and reputation testimony about Serbeck's untruthfulness, without inquiring into specific instances on direct examination. On cross-examination of Serbeck, rule 608 would allow Campos to inquire into specific instances probative of Serbeck's character for untruthfulness. But the trial court has discretion to allow or disallow such cross-examination. *See id.* R. 608(b). If the issue arises again in a new trial, the court should make this determination based on relevance and the principles of rule 403. *See Gomez*, 2002 UT 120, ¶¶ 33–34.


CONCLUSION

¶92     The trial court did not abuse its discretion in excluding Campos's proposed expert testimony, nor did it err in refusing a lesser included offense instruction on threatening with a dangerous weapon. Campos's trial counsel did not provide deficient assistance by failing to request a jury instruction on extreme emotional distress. However, Campos's trial counsel provided constitutionally deficient assistance by failing to object to the

inaccurate verdict form and by failing to object or request a curative instruction when the prosecutor engaged in misconduct in closing arguments. The cumulative effect of the deficient performance undermines our confidence that Campos received a fair trial, and absent counsel's errors, there is a reasonable probability of a different result.

¶93    We therefore reverse Campos's conviction for attempted murder with injury but affirm the conviction for aggravated assault. We remand the case for further proceedings.[13]

─────────

─────────

[13]To the extent that we have not explicitly addressed other issues raised by Campos, we have determined that we need not address them given our resolution of this appeal. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989).